BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

THOMAS R. GREEN (CABN 203480)
Assistant United States Attorney
    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    Facsimile:  (510) 637-3724
    E-Mail: thomas.green@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>CARRIE MYLES<br><br>    A/K/A "CARRIE MILES"<br>    A/K/A "CARRIE HOUSEAL"<br>    A/K/A "DANIELLE DAWN DAVIS"<br>    A/K/A "PEACHES"<br>    A/K/A "ASIA"<br><br>    Defendant. | No. CR 16-00409 HSG<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Sentencing: July 10, 2017 |

The United States respectfully submits this sentencing memorandum in support of the government's position regarding an appropriate sentence for defendant's crime. The United States recommends defendant to be sentenced to the statutory maximum sentence of ten (10) years, a sentence which equates to a below guideline sentence given the undisputed guideline sentence of 121 to 151 months she otherwise faces. The government also joins in the recommendation of the United States

Probation Office that defendant's custodial term should be followed by five (5) years of supervised release. Though restitution is mandatory in this case, as of the time of this filing, the child victim has not expressed an interest in maintaining any connection to this case and the victimization she suffered. Finally, a $100 special assessment should be imposed against defendant for her count of conviction.

## BACKGROUND

The Presentence Investigative Report ("PSR") details the facts of this case and defendant's post-arrest conduct that warrant the recommended sentence. In short, defendant recruited the child victim (referred to as "M.T.") to engage in dangerous sexual encounters for money with strangers, and then asserted complete control over M.T., profiting from the dangerous acts she promoted and facilitated until their arrest on September 8, 2015.

### Pre-arrest Conduct

Defendant met M.T. in approximately late July 2015. M.T. had recently travelled to the East Bay and was living with a young woman she knew from a group home they both lived at as children. *See* PSR, ¶16. M.T. made money working as a prostitute, money she provided to her friend. *See id*. Their time together was brief, as defendant soon met M.T. and wooed her to work as a prostitute for her. Defendant convinced M.T. to work under her guidance, touting her experience, ability to drive M.T. to dates, and offering M.T. all the marijuana she wanted to entice M.T. to move in with defendant, a stranger to M.T. when she began living with her. *See* PSR, ¶17.

From that day forward, M.T. worked as a prostitute for defendant nearly every day, sometimes multiple times per day. *See* PSR, ¶18. Defendant's control over M.T. and the dates she generated for her was absolute. Defendant posted advertisements on backpage.com advertising M.T.'s services, and instructed M.T. to do the same. The advertisements included provocative photographs of a partially dressed child, sometimes wearing outfits exposing her breasts to potential customers. Defendant took the photos of M.T. used in the advertisements and provided her with the scant clothing she wore for the photographs. Defendant provided clothing for dates as well, dates she arranged.

Defendant's control over M.T. was so thorough that she controlled the Google account associated with the Google Voice phone number M.T. used. The same number was included in the advertisements promoting M.T.'s services. This enabled defendant to keep track of the phone calls and

text messages M.T. received, including text messages sent to M.T. by potential customers. Defendant could even respond to customer text messages to M.T.'s Google Voice number, as if she was M.T., from her own phone or computer. Defendant did this in part because she wanted to control the words and tone M.T. used when communicating with customers. Defendant would get upset with M.T. for the unenthusiastic way she communicated with customers, and this tool enabled defendant to control the sales pitch to customers and generate more work and more money. *See* PSR, ¶¶18-19 and 41.

It is not surprising that M.T. did not know how to speak with customers and lacked sufficient enthusiasm for the trade. *See id.* She was 14 years old, and her youthful age was evident by her muted ability to interface with adults. M.T. may have been able to wear sufficient makeup and provocative clothing to look older than her age, but small details such as her inability to communicate with adults plainly convey her youth. For example, M.T. did not know any of the streets where she was living, not even the street of the apartment where she lived with defendant, despite traveling on a daily basis throughout the east bay for dates with adults. *See* PSR, ¶20. Instead, she described the place where she lived as the red and green colored building. *See id.* That is how children describe where they live.

Defendant knew M.T. was a child. M.T. told her she was only 15 (actually 14) when she met defendant and moved into her apartment. Defendant then instructed M.T. to tell clients she was some age between 18 and 24. The advertisements they posted similarly asserted M.T. was an adult when defendant knew otherwise. At least one such advertisement promoting the commercial sex services defendant urged M.T. to perform was posted in Las Vegas, Nevada, where defendant drove M.T. to have sex with adults. The text conversation between defendant and her acquaintance on a September 5, 2015 trip to Las Vegas expresses in plain terms that defendant acted as a pimp for M.T. and another "girl" who traveled with them to Vegas.

Myles: "Trying to get these girls some work… you know any tricks here?"

*See* PSR, ¶26. A few days later, law enforcement arrested defendant and M.T. in Oakland after defendant dropped M.T. off for a date with an undercover police officer at a hotel, only a short time after they drove back from Las Vegas. In arranging the date, the undercover officer believed he was communicating directly with M.T., texting the phone number listed in the advertisements and receiving text messages in return. In fact, the officer was communicating with defendant, who was controlling the

conversation with the potential customer from her own telephone via the Google Voice application she used.  *See* PSR, ¶41.

### Post-arrest Conduct

Though the government is not aware of defendant having any further contact with M.T. following their September 8 arrest, she was involved in attempting to eliminate evidence in connection with her son's arrest for gun charges and pimping four different juvenile girls.  Defendant's son and another woman were arrested on June 8, 2016, after they forced four girls to work as prostitutes.  *See* PSR, ¶30.  Law enforcement interviewed three of the four victim girls, and all confirmed that defendant's son, Cedric Houseal, a convicted felon, was armed with a handgun which he used to "pistol whip" two of the girls after they failed to pick up any prostitution customers.  *See id.*  Later that day, law enforcement obtained and executed a search warrant for the residence where Houseal held the girls captive.  Law enforcement found three firearms at the residence, one with a loaded extended magazine and another with an obliterated serial number.  They found two additional magazines, but no associated firearm, for a .40 caliber Glock handgun and a 9mm Glock handgun.  *See* PSR, ¶31.  Myles visited her son at Santa Rita Jail two weeks later.  Santa Rita recorded their conversation, and the recording reveals that defendant had obtained both "the forty" and "the nine," which were removed from her son's residence prior to execution of the search warrant.  *See* PSR, ¶32.  The "forty" and the "nine" removed from the crime scene ahead of execution of the search warrant match the types of firearms associated with the stray magazines uncovered during execution of the warrant.  *See id.*

Jail call recordings between defendant and her son show additional efforts to eliminate evidence of their crimes.  With respect to her crime in this case, defendant told a friend during a call recorded on September 9, 2015, "call Cedric immediately and tell him that he needs everything inside of his care, take everything out of the house cause I told them a who different other address [sic] but I don't know if they might come and just check."  In another call later that day with the same friend, defendant instructed:

> Oh ok tell [my son] to erase everything in that motherfucker. . . . Everything tell him to erase all them pictures off of our computer everything [sic].  And then that way they can just keep the computer with them but I want him to either deactivate my email or erase all of every message there is in that motherfucker.

*See* PSR, ¶29. Houseal similarly asked defendant to delete electronic evidence when he was arrested, instructing her to delete his Instagram account in a recorded jail call following his arrest for pimping and other crimes. *See* PSR, ¶32.

Myles' cell phone, recovered during her later arrest for the charges in this case, indicate Myles continued to act as a pimp and was in illegal possession of firearms after her initial arrest on September 8, 2015. A text exchange demonstrates she was attempting to sell three firearms to a person identified by her phone as "Dre Ceddy Friend," an apparent reference to her son Cedric's friend. During the text exchange defendant also casually references her continued pimping, stating, "I'm trying to get these bitches on the blade," a reference to the "track" or street where prostitutes meet customers. *See* PSR, ¶39.

## SENTENCING RECOMMENDATIONS

**A.  The Defendant's Offense Level.**

The parties and the U.S. Probation Office agree on defendant's offense level, calculated as follows:

|   |   |   |   |
|---|---|---|---|
| a. | Base Offense Level: (U.S.S.G. § 2G1.3(a)(4)): | | 24 |
| b. | Specific Offense Characteristics: Minor in the custody or care of defendant (U.S.S.G. § 2G1.3(b)(1)(B)): | | +2 |
|   | Knowing misrepresentation of age and unduly influenced minor to engage in prohibited sexual act (U.S.S.G. § 2G1.3(b)(2)(A) and (B)): | | +2 |
|   | Offense involved use of computer: (A) to persuade the minor to engage in prohibited sexual act; and (B) encourage a person to engage in prohibited sexual act with a minor   (U.S.S.G. § 2G1.3(b)(3)(A) and (B)): | | +2 |
|   | Offense involved a commercial sex act (U.S.S.G. § 2G1.3(b)(4)(B)): | | +2 |
| c. | Acceptance of Responsibility: If I meet the requirements of U.S.S.G. §3E1.1, I may be entitled to a three-level reduction. | | -3 |
| d. | Total Offense Level: | | 29 |

**B.  The Defendants' Criminal History Category Calculation.**

Neither the government nor defendant has objected to or disputed the U.S. Probation Office's

detailed summary of defendant's criminal history or its calculation of her criminal history category of IV. Defendant has suffered 11 prior criminal convictions, many of which do not acquire criminal history points because sufficient time has passed to preclude their calculation, including multiple theft and prostitution convictions and a conviction in 2003 for unlawful possession of a firearm by a convicted felon. Included in defendant's calculation, however, is a 2008 felony burglary conviction (2 points), and misdemeanor convictions for disorderly conduct and prostitution in 2010 (2 points) and reckless driving in 2012 (1 point). Because defendant was on probation for the burglary conviction at the time of the present offense, two additional points are added to make a total criminal history score of seven (7) points, which results in defendant being Criminal History Category IV.

**C.     A 120-Month Prison Term Is the Reasonable and Appropriate Sentence.**

Defendant should be sentenced to the maximum allowable sentence of 120 months, a term which equates to a below guideline sentence for her crime, which otherwise carries a guideline sentence of 121 to 151 months.

Defendant asserts now that she wanted M.T. to avoid the situations she found herself in earlier in her own life. In fact, she placed M.T. in precisely the situations she says she experienced. She sought out dangerous encounters for M.T., a 14 year-old girl, arranged for those encounters to take place, and left her alone with adult strangers, all to enrich herself at M.T.'s expense. While defendant has had a troubled past, her troubled past cannot excuse her actions. To the contrary, the PSR's recount of defendant's personal history informs that defendant had first-hand knowledge of the scope of risks M.T. faced when defendant encouraged her daily prostitution. Defendant recounts an occasion when she was working as a prostitute between 2006 and 2011 when a customer held a screwdriver to her neck while she was in the customer's vehicle. Fortunately, for defendant, who was approximately 28 to 33 years old at the time, she was able to grab the screwdriver, stab the customer in the leg, and escape. Yet defendant placed M.T. into this type of environment, without any supervision, when she was 14 years old.

A 120-month prison term is the appropriate and just sentence in this case. The recommended sentence properly accounts for the serious nature and circumstances of the instant offense—the sex trafficking of a vulnerable 14-year old child. Defendant exercised substantial control over M.T., even

pretending to be M.T. in communications with potential customers because M.T. lacked the maturity to interface with adults when making dates.  M.T., in turn, was heavily reliant on defendant.  She did not even know the address where she lived with defendant for a month, and was unable to describe the area in which she lived, and worked.  These factors evidence not only M.T.'s youth, but also that defendant's activities were driven by profit, not concern for the welfare of the child.  The defendant's conduct is alarming and worthy of a sentence consistent with the guideline approach to sentencing such crimes.

This sentence also appropriately accounts for the history and characteristics of the defendant, namely her criminal history and continued crimes following her arrest.  *See* 18 U.S.C. § 3553(a)(1).  The criminal conduct that post-dates her initial arrest reflects a lack of remorse and ongoing participation in pimping activities as a source of income, not as a wayward attempt to protect M.T. from the troubles that plagued defendant's life.

Finally, the recommended sentence also serves the need for adequate deterrence, protection of the community from further crimes of the defendant, and just punishment for the offense.  *See* 18 U.S.C. § 3553(a)(2)(A),(B),(C).  A 120-month sentence will avoid unwarranted sentencing disparities for similarly situated defendants.  *See* 18 U.S.C. § 3553(a)(6).

## **CONCLUSION**

The United States respectfully requests that the Court determine the aforementioned Offense Levels and Criminal History Categories for defendant, and sentence her to 120 months in prison, five (5) years of supervised release to follow incarceration, which should include a requirement for defendant to register as a sex offender, and a $100 special assessment.

DATED: July 3, 2017                                  Respectfully submitted,

BRIAN J. STRETCH
United States Attorney


          /s/
THOMAS R. GREEN
Assistant United States Attorney