STEVEN G. KALAR
Federal Public Defender
HANNI M. FAKHOURY
Assistant Federal Public Defender
1301 Clay Street, Suite 1350N
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:   (510) 637-3507
Email:       hanni_fakhoury@fd.org

Attorneys for CARRIE MYLES

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 16-409-HSG |
| Plaintiff, | DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE |
| v. | |
| CARRIE MYLES, | Date:  July 10, 2017 |
| Defendant. | Time: 2:00 p.m. |

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 2

A.  The History and Characteristics of Ms. Myles. ................................................................. 2

    1.  Ms. Myles' Upbringing and Frayed Relationship With Her Mother................................. 2

    2.  Ms. Myles' Abusive Relationship With Twano Houseal. .................................................. 4

    3.  David Turner Introduces Ms. Myles to Sex Work............................................................. 5

    4.  Ramon Bennett Continues the Abuse While Ms. Myles' Continues Sex Work................. 6

    5.  Ms. Myles Takes Custody of Her Kids and Her Life Stabilize. ........................................ 7

B.  The Nature and Circumstances of the Offense. ................................................................. 7

C.  Federal Court Proceedings. ................................................................................................ 9

D.  Ms. Myles' Future Rehabilitation Goals and Plans. .......................................................... 9

ARGUMENT ............................................................................................................................. 11

A.  Seriousness of the Offense, Respect for the Law and Just Punishment............................ 11

B.  Deterring Criminal Conduct and Protecting the Public. ................................................... 12

C.  Providing Training, Medical Care or Other Treatment. .................................................... 13

D.  The Guidelines Sentencing Range. .................................................................................... 14

E.  Avoiding Unwarranted Sentencing Disparities. ................................................................ 14

OBJECTIONS TO PROPOSED SUPERVISED RELEASE CONDITIONS ....................... 15

A.  Condition #6: No Computer Use Without Prior Approval. ............................................... 16

B.  Condition #7: Enrollment in CIMP.................................................................................... 16

C.  Condition #8: No Internet Access Without Prior Approval............................................... 16

D.  Condition #9: Random Inspections of Computer Equipment............................................ 17

E.  Condition #10: Prohibition on Use of Data Encryption..................................................... 17

CONCLUSION .......................................................................................................................... 18

1

## TABLE OF AUTHORITIES

2

### Cases

3    *California v. Brown*, 479 U.S. 538 (1987) ................................................................................. 2

4    *Gall v. United States*, 552 U.S. 38 (2007) ........................................................................... 11, 14

5    *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ......................................................... 16

6    *United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009) ....................................... 14

7    *United States v. Bad Marriage*, 392 F.3d 1103 (9th Cir. 2004) .............................................. 13

8    *United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) ......................................................... 11

9    *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc) ............................................ 11

10   *United States v. Goddard*, 537 F.3d 1087 (9th Cir. 2008) ...................................................... 18

11   *United States v. Johnson*, 529 U.S. 53 (2000) ........................................................................ 13

12   *United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016) ...................................................... 15

13   *United States v. Sales*, 476 F.3d 732 (9th Cir. 2007) ............................................................. 16

14   *Williams v. New York*, 337 U.S. 241 (1949) ............................................................................ 11

15

### Statutes

16   18 U.S.C. § 2421(a) .................................................................................................................. 14

17   18 U.S.C. § 3553(a) ........................................................................................................... *passim*

18   18 U.S.C. § 3582 ....................................................................................................................... 13

19   42 U.S.C. § 16911(3) ................................................................................................................ 12

20   42 U.S.C. § 16913(a) ................................................................................................................ 12

21   42 U.S.C. § 16915(a)(2) ............................................................................................................ 12

22

### U.S. Sentencing Guidelines

23   U.S.S.G. § 5G1.1(a) .................................................................................................................. 14

24

25

26

27

28

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Myles*, CR 16-409-HSG

## **INTRODUCTION**

A teenage girl grows up in a dysfunctional home.  She longs for attention, affection and financial security.  She engages in risky behavior, including drug and alcohol abuse.  She becomes sexually active at a young age, a 14 year old sleeping with older men.  She is traumatized and troubled for the rest of her life, a young soul whose life spirals out of control until it hits rock bottom.

M.T.'s sad story is one Carrie Myles has lived before.  Twenty-five years ago, Ms. Myles was a lot like M.T.  Looking to leave a broken home, she found herself pregnant at 15 years old, about to embark in a vicious life journey, where she would suffer domestic violence and abuse.  Like, M.T., Ms. Myles worked on Oakland's International Boulevard, the notorious "track" where prostitutes congregate looking to find "dates" and avoid the police.  She escaped to drugs and alcohol, which only impaired her judgment, leading to this crucial moment in Ms. Myles' life.

For the first time, Ms. Myles will be sent to prison for her mistakes.  She will have to register as a sex offender for years to come.  She will have to live with the knowledge that while she may have thought she was helping M.T. avoid the mean streets of Oakland and the physical violence Ms. Myles suffered at the hands of pimps, Ms. Myles also inflicted pain and trauma she hoped no one else would suffer.  She feels "major regrets and sadness in my heart for hurting M and everyone in my life.  I would never want to make anyone feel the pain that I have felt in my past."  Exh. A, Letter of Carrie Myles ("Myles Letter").

Dr. Tara Collins from the University of California, San Francisco Department of Psychiatry concludes Ms. Myles' lifetime of stress and trauma has taken a major toll on Ms. Myles' mental health.  Ms. Myles suffers from post-traumatic stress disorder, borderline personality disorder and major depressive disorder.  Exh. B, June 2, 2017 Psychological Report of Tara Collins, M.D., M.P.H. ("Psych Report") at p. 2-3; *see also* Dkt. 36, Presentence Investigation Report ("PSR") ¶¶ 117-18.  Dr. Collins writes "Ms. Myles's life experiences, trauma (including traumatic brain injuries), mental illnesses, and substance use contributed to her cognitive deficits, distorted thought processes, poor decision making, and behaviors that led to the instant offense."  Exh. B, Psych Report at 4. Ms. Myles asks this Court to take her traumatic life into account and sentence her to serve 60 months in the Bureau of Prisons (BOP) followed by eight years of supervised release.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Myles*, CR 16-409-HSG

1

## STATEMENT OF FACTS

**A.    The History and Characteristics of Ms. Myles.**

To understand why Ms. Myles appears for sentencing, this Court must have a detailed understanding of her background and life experiences.  It is well known that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, concurring).

1.    Ms. Myles' Upbringing and Frayed Relationship With Her Mother.

Ms. Myles' difficult upbringing began when she was a child.  Her mother, Sharron Garig, rebelled from the strictures of a stable home and became pregnant with her first child, Devra Benavides, as a teenager.  Exh. C, Declaration of Madeline Larsen ("Larsen Dec.") p. 1, ¶ 2a.  Sharron became estranged from her family, and abused drugs.  *Id.* at p. 2, ¶¶ 2a-2b.  Like the daughter who would sadly emulate her much later, Sharron found herself in abusive, violent relationships.  *Id.* at p. 4, ¶ 3b.  Sharron turned her life around when she became a Jehovah's Witness.  *Id.* at p. 2, ¶ 2b; p. 4, ¶ 3b.  But she did not just become religious; according to Devra, she became a "fanatic."  *Id.* at p. 4, ¶ 3b.  Sharron's sister, Cathy Ennon, writes Sharron "threw out everything she knew from her upbringing" and "became alienated from their family and pulled herself out of all family celebrations for birthdays and holidays.  She would return birthday cards and gifts unopened."  *Id.* at p. 2, ¶ 2b.  She told her family members "they were going to hell and that they weren't going to be saved," did not attend family funerals—including those of her own parents—and took a "hard line" about her religion.  *Id.* at p. 2, ¶ 2d.

Part of Sharron's religious obligations included preaching to others, including prison inmates.  *Id.* at p. 2, ¶ 2c.  So it was at San Quentin that Sharron met Sherman Myles.  The two began a relationship and Sharron became pregnant with Ms. Myles during a conjugal visit.  *Id.*  When Sherman released from prison, he lived with Sharron but quickly fell into his criminal ways.  After threats of violence, Sherman returned to his hometown of Chicago, leaving Sharron to care for her two young

1   daughters alone.  *Id.*  Sherman died in a car accident when Ms. Myles was less than two years old.  *Id.*;

2   PSR ¶¶ 87-89.  Ms. Myles never knew her father, which caused her a grief in her life.

3         Forced to support her two children without the assistance of either of their fathers, Sharron

4   consumed herself with work.  She moved in with her grandparents in order to save money and have

5   help with the kids.  Exh. C, Larsen Dec. at p. 6, ¶ 3i.  There, as a small child, Ms. Myles was sexually

6   molested by her great grandfather and his son in law, who were both alcoholics.  PSR ¶ 91; Exh. C,

7   Larsen Dec. p. 7, ¶ 3q.  The abuse continued for two years until the house they were living in burned

8   down, and Sharron, Ms. Myles and Devra moved out.  PSR ¶ 91.

9         Now completely on her own, Sharron had to work even harder and had even less involvement

10  with the day-to-day care of Ms. Myles.  So Devra raised Ms. Myles and the two grew close.  PSR ¶ 88-

11  89; Exh. C, Larsen Dec. at p. 3, ¶ 2h; p. 5, ¶ 3g.  Devra filled a void for Ms. Myles.  Cathy Ennon

12  believed Sharron placed her religion ahead of her children and was harsh with them.  Exh. C, Larsen

13  Dec. at p. 3, ¶ 3f.  Devra said Sharron was "cold and emotionally distant."  *Id.* at p. 5, ¶ 3g.  Sharron

14  was physically abusive towards her daughters, whipping them with a purple leather belt as punishment.

15  *Id.* at p. 5, ¶ 3h; PSR ¶ 92.  Needing love, Ms. Myles grew close with Devra, who gave her the

16  nurturing attention a little girl needed.

17        Sharron's strict religious beliefs, however, ultimately forced Devra out of the home.  Sharron

18  wanted her daughter to be a good Jehovah's Witness, but Devra—like her mother before—rebelled.

19  Exh. C, Larsen Dec. at p. 6, ¶ 3j.  Devra eventually moved out of her mother's house.  And when

20  Devra refused to "repent" after Sharron caught her smoking cigarettes, Sharron had the church

21  "disfellow" her.  *Id.*  Sharron cut off all contact with Devra and refused to speak to her.  *Id.*  As

22  Sharron's sister recalled, "there was nothing the family could say to Sharron to convince her to hold

23  onto the family she had before she became a Jehovah's Witness."  *Id.* at p. 2, ¶ 2d.

24        For Ms. Myles, she was now alone with Sharron.  That meant fending for herself.  At one point,

25  she missed an entire month of school before her mother realized she was not attending.  PSR ¶ 89.  It

26  also meant she began hanging out with the wrong crowd.  She began drinking alcohol and smoking

27  marijuana at the age of 13.  PSR ¶ 119-120.  Her grades suffered.  PSR ¶ 123.  It was clear that Ms.

28  Myles strived for love and affection, particularly after her sister Devra left the house.  Ultimately, Ms.

1   Myles' aunt Cathy Ennon believes "the Jehovah's Witness religion had a very negative effect on

2   Carrie and her home life."  Exh. C, Larsen Dec. at p. 2, ¶ 2f.  Unfortunately, perhaps like her mother

3   before her, Ms. Myles looked for that missing love in all the wrong places.

4         2.      Ms. Myles' Abusive Relationship With Twano Houseal.

5         Ms. Myles met Twano Houseal when she was 14 years old.  PSR ¶ 93.  He was two years older

6   than her.  *Id.* ¶ 95.  Ms. Myles became pregnant with their first child when she was just 15 years old.

7   *Id.*  From the beginning of their relationship as teenagers, Twano was emotionally, verbally, and

8   physically abusive towards Ms. Myles.  Exh. C, Larsen Dec. at p. 7, ¶ 3n.  Devra explained Twano

9   "was really crazy, especially when he drank."  Exh. C, Larsen Dec. at p. 7, ¶ 3n.  At 15 years old and

10  pregnant, Twano forcefully sodomized Ms. Myles.  PSR ¶ 95.  By the time Ms. Myles' son Cedric was

11  born when Ms. Myles was 16 years old, the stress of being a young mother in an abusive relationship

12  became too much to handle.  So Ms. Myles attempted to kill herself.  PSR ¶ 96.  Her mother found her

13  and called for help.  *Id.*  While Ms. Myles was hospitalized, Devra took care of her baby son.  Exh. C,

14  Larsen Dec. at p. 7, ¶ 3m.

15        Once released from the hospital, Ms. Myles quickly reunited with Twano and the violence

16  continued.  When she was 17 years old and pregnant with their second child, Twano beat Ms. Myles

17  with a piece of wood with nails attached to it.  PSR ¶ 95.  In another incident, Twano broke Ms.

18  Myles' elbow when he tried to throw her.  Arrested after that incident, Twano was released from jail

19  with no charges filed and promptly looked for Ms. Myles and attacked her on the head with a 40 ounce

20  liquor bottle.  *Id.*  Despite all of that, Ms. Myles married Twano when she turned 18 years old.

21  Marriages are supposed to be happy occasions.  But for Ms. Myles, her nightmare of abuse and

22  torment culminated in her second suicide attempt that same year.  She was distraught at learning that

23  Twano—her physically and emotionally abusive husband—had also been unfaithful and threatened to

24  leave her.  PSR ¶ 96.  She lay down on railroad tracks hoping a train would end her misery, only to be

25  found by Twano who took her to the hospital.

26        Most 19 year olds are looking at a world of possibilities: finished with high school, they may be

27  travelling the world or on their way to college, or working their first job.  At 19 years old, Ms. Myles

28

1  had two sons (with a third on the way), two suicide attempts, and a broken marriage.  Remarkably,

2  bigger problems were on the horizon.

3         3.     <u>David Turner Introduces Ms. Myles to Sex Work.</u>

4       It is a reflection at how difficult Ms. Myles' life was that despite the violent and volatile

5  relationship she had with Twano, her relationship with David Turner was worse.  She became involved

6  with David in 1999, when she was 19 years old.  PSR ¶ 98.  As with Twano, there was extensive

7  violence.  But David escalated the situation with firearms.  During one fight, Turner placed a barrel of

8  a gun in Ms. Myles' mouth.  PSR ¶ 100.  Other times he would hit Ms. Myles with the butt of a gun.

9  *Id.*  He would punch Ms. Myles in the face, put out a lit cigar on her face, and forced her to strip naked

10  and kicked her out of his car.  *Id.*  In 2001, Turner was charged with inflicting corporal injury on Ms.

11  Myles while armed with a firearm, and specifically directed not to threaten Ms. Myles.  PSR ¶ 102; *see*

12  *also* Exh. D, Records from Alameda County Case 141178.  But just as she remained with Twano, Ms.

13  Myles did not leave David.

14       In fact, David dragged Ms. Myles into his criminal endeavors.  By 2000, David had recruited

15  Ms. Myles into working as a prostitute.  He was no longer her boyfriend but her pimp.  Between 2000

16  and 2005, when she finally left Turner, Ms. Myles had three prostitution convictions, and three other

17  prostitution arrests that did not result in criminal convictions.  PSR ¶¶ 65-66, 68, 78-80.  She

18  advertised sex services in magazines and online services, and worked as a stripper.  PSR ¶¶ 98-99,

19  133.  All the money she earned went to David, who gave her permission to buy things or bought them

20  for her.  PSR ¶¶ 98-99.  Working as a prostitute led Ms. Myles to more aggressive drug use.  She used

21  ecstasy with David.  PSR ¶ 99.  The sex work led to cocaine use.  PSR ¶ 121.  She drank heavily and

22  became an alcoholic.  PSR ¶ 119.

23       Ms. Myles was afraid of David, who constantly threatened to kill her and her family.  PSR ¶ 101.

24  But she eventually worked up the courage to leave him.  In 2004, she secretly packed up her

25  belongings and a girlfriend picked her up and took her to Sacramento.  *Id.*  She has not seen David

26  since.  He has continued his crime spree, amassing a lengthy criminal history over the last 12 years.  In

27  2005, he was convicted of unlawful sexual intercourse with a minor for having sex with a 15 year old

28

in a hotel room in San Leandro, and sentenced to serve two years in state prison.[1]  In 2007, Mr. Turner was convicted in San Bernardino County of attempted pimping, and received a sentence of probation.[2]  In 2009, he was convicted of second-degree robbery in Alameda County and sentenced to three years in state prison.[3]  In 2010, he was convicted of human trafficking in Alameda County, and sentenced to probation.[4]  In 2012 he was convicted of procuring a person for prostitution in Alameda County, and sentenced to three years in state prison.[5]

4.      Ramon Bennett Continues the Abuse While Ms. Myles' Continues Sex Work.

Always starved for love and affection, Ms. Myles began a new relationship with Ramon Bennett. PSR ¶ 103.  According to Devra, "Ramon was also a drug dealer and his anger was out of control." Exh. C, Larsen Dec. at p. 8, ¶ 3q.  Having just finished a ten-year prison sentence, Ramon nonetheless continued to sell drugs, and like David Turner, brought Ms. Myles into his criminal schemes.  PSR ¶ 105.  And like Twano and David, Ramon was physically abusive.  In the course of their relationship, Ms. Myles would suffer a broken rib, punctured lung and a miscarriage at the hands of Ramon.  PSR ¶ 105.  Many of the fights stemmed from Ms. Myles sex work.  *Id.*  From 2006 to 2011, Ms. Myles continued to work as a prostitute, escort and stripper.  PSR ¶ 105.  The work was dangerous; one john attempted to attack Ms. Myles with a screwdriver.  *Id.*

In 2008, a warrant was issued for Ms. Myles arrest for burglary after she was accused of passing a counterfeit $100 bill at a Trader Joe's in Morgan Hill.  PSR ¶ 69. At that point, Ms. Myles went on the run attempting to avoid the police.  She was picked up two years later in Los Angeles following an arrest for prostitution.  PSR ¶ 70.  She received a 90 day jail sentence in Los Angeles County and then was sent to Santa Clara County, where in 2010 she received a probation sentence, which included 90 days in jail.  PSR ¶ 69.

---

[1] *People v. Turner*, Alameda County No. H37722.

[2] *People v. Turner*, San Bernardino County No. FWV036533.

[3] *People v. Turner*, Alameda County No. H45837.

[4] *People v. Turner*, Alameda County No. H49598.

[5] *People v. Turner*, Alameda County No. H52136.

1          5.      Ms. Myles Takes Custody of Her Kids and Her Life Stabilizes.

2          During her years "on the run," Ms. Myles' three sons were staying with their father Twano.  In

3   February 2011, Child Protective Services were called after Twano punched and slammed his oldest

4   son, Cedric, and choked the 14 year old boy until he lost consciousness.  PSR ¶ 103.  After that

5   incident, Ms. Myles took sole custody of her sons.  For several years, her life stabilized.  Between

6   2010 and 2015, Ms. Myles only suffered one misdemeanor conviction for reckless driving, for which

7   she served one day in jail.  PSR ¶ 71.  She had no prostitution related arrests or convictions.  She took

8   care of her kids and became more involved in their daily lives.  She was the "team mom" for her sons

9   Cedric and Twano Jr.'s football and basketball teams.  Exh. C, Larsen Dec. at p. 10-11, ¶¶ 5-6.  She set

10  up snack stands, drove other kids to games, moved equipment and kept the water jug filled.  One coach

11  could see that Ms. Myles was "a struggling young mother doing the best she could to take care of her

12  kids."  Exh. C, Larsen Dec. at p. 11, ¶ 6c.  She worked jobs in the retail and restaurant industries, as

13  well as worked as a caregiver and security guard through a temp agency.  PSR ¶¶ 127-31.  This was a

14  happy time in Ms. Myles' life, and Devra noted that "Carrie always tried to do her best taking care of

15  her three boys."  Exh. C, Larsen Dec. at p. 7, ¶ 3p.

16         But she was still haunted by her demons.  She continued abusing drugs and alcohol.  PSR ¶¶

17  119-22.  Her need to make "fast money" meant she still occasionally worked as a stripper, prostitute,

18  escort and dominatrix.  PSR ¶ 122.  It was the desire to earn quick money that ultimately led her to

19  make the poor decisions that resulted in a federal indictment.

20  **B.      The Nature and Circumstances of the Offense.**

21         In the summer of 2015, a troubled teenager, M.T., left her group home in Auburn, north of

22  Sacramento, and headed to Oakland.  PSR ¶ 16.  She was going south to "hang out" with a fellow

23  group home resident she met in Auburn named Allie.  *Id.*  When M.T. got to Oakland, Allie convinced

24  her to work as a prostitute.  *Id.*  For some period of time, M.T. worked for Allie, who took M.T. to

25  International Boulevard in Oakland and helped her create backpage.com ads advertising escort

26  services.  *Id.*  Ms. Myles met M.T. through Allie.  In August 2015, M.T. moved into Ms. Myles' home

27  and continued working as a prostitute.  PSR ¶¶ 17-18.  The indictment in this case stems from a trip in

28  September 2015, where Ms. Myles drove M.T. and another woman to Las Vegas to engage in

1   prostitution.  PSR ¶¶ 13, 26, 41.  The purpose of the trip was not just for M.T. to engage in

2   prostitution, but for Ms. Myles herself to pick up dates and make ends meet.  After returning from Las

3   Vegas, M.T. and Ms. Myles were arrested in Oakland on September 8, 2015 during an Oakland Police

4   department undercover operation.  *Id.* ¶¶ 7-8.  At the time of the arrest, Ms. Myles was two months shy

5   of terminating probation in the Santa Clara County burglary case.  *Id.* ¶ 69.

6          Ms. Myles' involvement with M.T. was, in part, a foolish attempt to spare M.T. the trauma she

7   herself had suffered working as a prostitute on the streets of Oakland and Los Angeles.  She saw that

8   M.T. had made her own decision to start working as a prostitute before she met Ms. Myles.  As Ms.

9   Myles explained to the probation officer, "My life experiences – molestation, physical abuse and

10  struggling to survive – brought me to this moment. I wanted MT to avoid the situations I found myself

11  in.  I wanted to help her avoid men who manipulate and cheat and abuse women."  PSR ¶ 44.  Unlike

12  the men in her life, Ms. Myles was not physically abusive to M.T., and the minor confirmed that Ms.

13  Myles "never hit or physically abused her."  PSR ¶ 19.

14         This is not just an after the fact rationalization of her illegal actions.  As Dr. Collins notes "a

15  growing body of evidence demonstrates a correlation between female victims of sex trafficking

16  becoming traffickers, for a multitude of reasons."  Exh. B, Psych Report at 4.  Her mental health

17  disorders exacerbated Ms. Myles' poor decision making.  Dr. Collins explains that like many

18  individuals who suffer from "[c]omplex PTSD, BPD, and MDD, Ms. Myles developed cognitive

19  distortions (irrational, inflated thoughts or beliefs that distort a person's perception of reality, usually

20  in a negative way) about her identity, self-worth, capabilities, agency, and the world. These distortions,

21  coupled with addictions and economic hardships, led to ongoing risky behaviors and illegal activities."

22  *Id.*  Ms. Myles echoes that sentiment, when writing that her traumatic experiences "did some very

23  major damage to me and hurt me deeply mentally [and] physically to where it made me look at life for

24  others and my own life completely differently and now I'm here."  Exh. A, Myles Letter.

25         In addition to her mental health issues, Ms. Myles' gender played a role in her criminal behavior

26  too.  Dr. Collins explains

27

28

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Myles,* CR 16-409-HSG

> Childhood victimization may be particularly important in the genesis of female criminality. One prevalent theory of female offending suggests female criminality is based on the need to survive abuse and poverty, coupled with substance abuse and dependence. Researchers refer to 'spiraling marginality' in reference to the decline in functioning seen when women with limited socioeconomic resources and traumatic histories begin to engage in criminal activity.

Exh. B, Psych Report at 4. Ms. Myles difficult upbringing—sexual abuse as a young girl, a strained relationship with her mother and becoming a mother herself at a young age—all created a feeling in Ms. Myles that she had to do whatever it took to survive, including risky and illegal acts.

Ultimately, Ms. Myles recognizes her actions were wrong. As she writes, "my actions were unjustified and I realize by doing what I did [I hindered] not only 'M' but my own flesh and blood and family lives. I take full responsibility for my actions that were not thought out well for me to realize the wrong I have done." Exh. A, Myles Sentencing Letter. She feels "major regrets and sadness in my heart for hurting M and everyone in my life. I would never want to make anyone feel the pain that I have felt in my past." *Id.*

## C.    Federal Court Proceedings.

After the September 2015 arrest, Ms. Myles was booked at the Santa Rita jail but released after two days. PSR ¶ 85. Nearly a year later, Ms. Myles was indicted in September 2016 and arrested in October 2016. *See* Dkt. 1, 3. During that year, Ms. Myles had no contact with M.T. and was not arrested for any other crimes. Once brought to federal court, Ms. Myles waived her right to a detention hearing, did not file any pretrial motions and entered a plea agreement with the government within four months of her initial appearance. *See* Dkt. 12, 23, 24.

## D.    Ms. Myles' Future Rehabilitation Goals and Plans.

There is little disagreement that Ms. Myles is in need of help. Dr. Collins reports that Ms. Myles' lifetime of violence, sexual abuse and trauma has significantly diminished her mental state. In Dr. Collins' opinion, Ms. Myles suffers from post-traumatic stress disorder (PTSD), borderline personality disorder (BPD) and major depressive disorder (MDD).

Ms. Myles recognizes she needs help and while in custody for the last nine months, has thought about her life choices. In an art therapy class, she drew a map of her life and how she got to this point. Exh. E, Map. She has been taking parenting classes and reminiscing about happier times. Exh. F, Art

1   Therapy Artwork and Certificates.  In her letter to the Court, Ms. Myles explains she is "willing to do

2   what it takes in the time I'm given to make amends to this situation and rebuild my life with my kids,

3   and close friends."  Exh. A, Myles Letter.

4   Despite the trauma she has suffered in her life, she has never received meaningful mental health

5   counseling or drug treatment.  PSR ¶ 122.  In fact, Dr. Collins notes "Ms. Myles's chronic mental

6   illnesses were never adequately treated, and were worsened by ongoing substance use."  Exh. B, Psych

7   Report at 4.  The only way to keep Ms. Myles out of the criminal justice system is by getting her the

8   long delayed treatment that she needs.  Dr. Collins believes Ms. Myles "requires extensive therapy."

9   *Id.*  Though medication will helps Ms. Myles deal with the symptoms of her mood and trauma-related

10  disorders, effective treatment requires the integration of "medication, psychotherapy psychoeducation,

11  and other supportive measures."  *Id.*

12  The problem, as Dr. Collins writes, is that the "vast majority of jails and prisons do not offer

13  individual and/or group therapy to adequately treat" personality disorders or major depression.  *Id.* at

14  5.  In fact, Dr. Collins believes "[i]t is probable that her symptoms will worsen in jail and/or prison."

15  *Id.* at 4.  She elaborates

16       the conditions in jails and prisons can be triggering for individuals with Ms. Myles's
         cluster of disorders, often resulting in further victimization and worsened symptoms.
17       There can be many negative effects, but especially problematic are ongoing issues with
         anger outbursts and irritability.  These issues can lead to conflict with peers and staff, as
18       well as the loss of certain privileges, such as the ability to attend group therapy, which in
         turn worsens symptoms.  In addition to problems while incarcerated, individuals with
19       inadequately treated mental disorders and substance use disorders are at an increased risk
         of recidivism once released.
20

21  *Id.* at 5.  There are also questions about how effective any treatment Ms. Myles receives while

22  incarcerated will be because of her gender.  Again, Dr. Collins notes

23       There is very little evidence-based treatment for mental disorders in incarcerated women.
         The majority of research and treatment trials targeting incarcerated individuals has been
24       focused on men, and it is unknown if this body of evidence can be applied to women.
         There are also many notable differences between incarcerated women and women in the
25       general population such that research on treatment in the community cannot necessarily
         be applied to incarcerated women as well.
26

27  *Id.*  So while Ms. Myles understands she must receive a significant prison sentence and has agreed to

28  serve at least five years in prison, any extra day of custody will only impede her rehabilitation.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Myles*, CR 16-409-HSG

1

**ARGUMENT**

2      Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*,

3   337 U.S. 241, 247 (1949).  That requires "the sentencing judge to consider every convicted person as

4   an individual and every case as a unique study in the human failings that sometimes mitigate,

5   sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52

6   (2007) (quotations omitted).  The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling

7   this mandate to make "an individualized assessment of a particular defendant's culpability rather than

8   a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*,

9   771 F.2d 1362, 1365 (9th Cir. 1985).  The sentence recommended in the Sentencing Guidelines is only

10   one factor for district courts to consider in making this judgment, and it may not be weighed more

11   heavily than any other § 3553(a) factor.  *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d

12   984, 991 (9th Cir. 2008) (en banc).

13      The probation officer recognizes that a variance from the Guideline range is appropriate in this

14   case given Ms. Myles' "difficult childhood; lack of youthful guidance; long history of physical,

15   emotional, and sexual abuse; and history of mental health and substance abuse issues."  PSR

16   Sentencing Recommendation at p. 3.  Ms. Myles agrees that a variance is warranted in this case, but

17   asks this Court to impose a 60-month sentence.  Instead of imposing three additional years of prison—

18   as recommended by the probation officer—Ms. Myles instead asks this Court to impose an additional

19   three years of supervised release, for a total supervised release term of eight years, in order to give Ms.

20   Myles structure and resources to address her mental health issues and drug addiction.

21   **A.   Seriousness of the Offense, Respect for the Law and Just Punishment.**

22      There is no question that human trafficking of minors is a serious crime with lasting, harmful

23   impacts to not just the minor victim, but society as a whole.  Yet, the Supreme Court has warned "a

24   sentence of imprisonment may work to promote not respect, but derision, of the law if the law is

25   viewed as merely a means to dispense harsh punishment without taking into account the real conduct

26   and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

27      Ms. Myles saw a piece of herself in M.T. and hoped to keep her out of the abusive situations and

28   trouble with men that Ms. Myles suffered in her own life.  As Dr. Collins writes, "Ms. Myles stated

1  that because of her background, her behavior was a misguided attempt to assist the victim in avoiding

2  becoming involved with abusive and violent male traffickers." Exh. B, Psych Report at 5. Ms. Myles

3  explained to the probation officer, "My life experiences – molestation, physical abuse and struggling to

4  survive – brought me to this moment. I wanted MT to avoid the situations I found myself in. I wanted

5  to help her avoid men who manipulate and cheat and abuse women." PSR ¶ 44. This of course is no

6  excuse for Ms. Myles actions, and she will have to pay a heavy price for her mistake by losing years of

7  her freedom. But the motivations behind Ms. Myles' conduct—the "real circumstances" of her own

8  traumatic and violent experiences working as a prostitute—lead her to this moment and should be

9  taken into account when determining a just punishment. *See Gall*, 552 U.S. at 54.

10  Moreover, a major consequence of Ms. Myles' conviction will be the requirement she register as

11  a sex offender for up to the next twenty-five years. *See* 42 U.S.C. §§ 16913(a) (registration

12  requirements); § 16915(a)(2) (twenty-five year registration period for tier II sex offender); § 16911(3)

13  (defining "tier II sex offender"). Sex offender registration has weighed heavily on Ms. Myles, as she

14  "is very concerned as to how being a registered sex offender will affect her ability to work and

15  maintain housing." Exh. B, Psych Report at 5. This is a significant collateral consequence of her

16  actions, which demonstrates the seriousness of the offense and will encourage others to respect the

17  law. Given the registration requirements, there is no need to impose a sentence longer than 60 months.

18  **B.  Deterring Criminal Conduct and Protecting the Public.**

19  A five-year prison term is adequate deterrence for Ms. Myles specifically. She has never been to

20  prison before. Her longest custodial sentence has been 120 days in jail. PSR ¶ 68. A five-year

21  sentence is a significant increase in punishment, one that reflects the seriousness of her criminal

22  conduct and will deter others from committing similar crimes.

23  As for protecting the public, the Court need not worry about Ms. Myles committing a new sex

24  offense upon her release from custody. The Department of Justice itself has found that the "sexual

25  recidivism rate" for sex offenders is significantly lower than the general recidivism rate overall.[6] This

26  

---

27  [6] *See* Exh. G, Roger Pryzbylski, "Recidivism of Adult Sexual Offenders," U.S. Department of Justice, Office of Justice Programs, Sex Offender Management Assessment and Planning Initiative (SOMAPI)

28  Research Brief, July 2015, at p. 2, *available at* https://www.smart.gov/pdfs/RecidivismofAdultSexualOffenders.pdf.

1    same report noted "[r]esearch demonstrates that female sex offenders reoffend at significantly lower

2    rates than male sex offenders."  It cited one study finding only a 1% sex offense recidivism rate for

3    female sex offenders, compared to a 20% overall recidivism rate.  Another study found an average

4    sexual recidivism rate of just 3% for female sex offenders over a six-year period.[7]

5    **C.**     **Providing Training, Medical Care or Other Treatment.**

6         "The underlying purposes of sentencing include not only punishment and deterrence, but also the

7    provision of treatment to a defendant in need of it."  *United States v. Bad Marriage*, 392 F.3d 1103,

8    1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)).

9         Ms. Myles is clearly in need of mental health and drug treatment.  Ms. Myles suffers from

10   PTSD, borderline personality disorder, chronic trauma, major depression and drug addiction.  Exh. B,

11   Psych Report at 3; PSR ¶ 117.  Dr. Collins notes Ms. Myles "requires extensive therapy," yet worries

12   that the "vast majority of jails and prisons do not offer individual and/or group therapy to adequately

13   treat" personality disorders or major depression.  Exh. B, Psych Report at 4-5.  Most problematic is Dr.

14   Collins' belief that Ms. Myles' "symptoms will worsen in jail and/or prison."  *Id.* at 4.  Dr. Collins

15   explains custody can "be triggering for individuals with Ms. Myles's cluster of disorders, often

16   resulting in further victimization and worsened symptoms" due to "ongoing issues with anger

17   outbursts and irritability.  *Id.* at 5.

18        Congress agrees with Dr. Collins' assessment about prison not being conducive to Ms. Myles'

19   rehabilitation.  It has cautioned courts to recognize that "imprisonment is not an appropriate means of

20   promoting correction and rehabilitation."  18 U.S.C. § 3582(a).  Instead, "Congress intended

21   supervised release to assist individuals in their transition to community life. Supervised release fulfills

22   rehabilitative ends, distinct from those served by incarceration."  *United States v. Johnson*, 529 U.S.

23   53, 59 (2000) (citing 18 U.S.C. § 3553(a)(2)(D)).

24        Ms. Myles accepts that she will have to be incarcerated and is prepared to work on her

25   rehabilitation the best she can while in prison.  She will participate in whatever counseling is available

26   and is eager to participate in the BOP's residential drug abuse program.  But given the extensive

27

28   [7] *Id.* at p. 3.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*United States v. Myles*, CR 16-409-HSG

1   therapy she needs to turn her life around and deal with her traumas, prolonging her prison stay beyond

2   five years will only be detrimental to her rehabilitation and treatment.  Thus, the need for rehabilitation

3   and treatment supports a 60-month sentence in this case, to be followed by a longer period of

4   supervised release.

5   **D.    The Guidelines Sentencing Range.**

6   　　　The parties agree on the advisory Guideline range.  As detailed in the PSR, Ms. Myles' final

7   offense level is 29.  PSR ¶ 58.  She has seven criminal history points, placing her in criminal history

8   category IV.  PSR ¶ 74.  The Guideline range is between 121 and 151 months.  PSR ¶ 138.  Because

9   the statutory maximum is 120 months, however, the Guideline range is therefore 120 months.  *Id.*; *see*

10  18 U.S.C. § 2421(a); U.S.S.G. § 5G1.1(a).

11  　　　Of course, however, the Sentencing Guidelines are merely advisory and just one factor for the

12  Court to consider.  As recognized by the probation officer, a downward variance from the Guideline

13  range is appropriate in this case due to Ms. Myles' "difficult childhood, lack of youthful guidance,

14  mental health issues, and long history of abuse."  PSR ¶ 155.

15  **E.    Avoiding Unwarranted Sentencing Disparities.**

16  　　　While the Court must avoid unwarranted sentencing disparities among defendants with similar

17  records who are convicted of similar conduct, the Ninth Circuit has explained sentencing courts must

18  also "avoid 'unwarranted *similarities* among [defendants] who were not similarly situated.'"  *United*

19  *States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55

20  (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

21  　　　A sentence longer than 60 months would lead to an unwarranted similarity with a defendant like

22  David Turner, who have repeated criminal conduct involving minors, or who used threats of force or

23  violence towards a minor, or possessed or used a firearm.  Mr. Turner has three sex-related convictions

24  and has been to prison numerous times, but the longest sentence he has received was three years in

25  state prison.  M.T. confirmed to authorities that Ms. Myles "never hit or physically abused her."  PSR

26  ¶ 19.  Nor did law enforcement find weapons or firearms on Ms. Myles or in her home when she was

27  arrested by the Oakland police in September 2015 or when a search warrant was executed at her home

28

1   in October 2016.  PSR ¶¶ 7-12, 36.[8]  Thus, a five year prison sentence would avoid unwarranted

2   sentencing disparities.

3   <u>**OBJECTIONS TO PROPOSED SUPERVISED RELEASE CONDITIONS**</u>

4          Ms. Myles objects to proposed special conditions 6 through 10 of supervised release.  All five of

5   these proposed conditions restrict Ms. Myles' ability to use computers—interpreted broadly to include

6   cell phones—and the Internet.

7          Although "District judges enjoy broad discretion in fashioning" supervised release conditions,

8   "Congress has nonetheless set limits on the exercise of that discretion."  *United States v. LaCoste*, 821

9   F.3d 1187, 1190 (9th Cir. 2016).  There are "three primary constraints" on imposition of supervised

10  release conditions.  *Id.*  The condition must (1) "be reasonably related to the nature and circumstances

11  of the offense; the history and characteristics of the defendant; or the sentencing-related goals of

12  deterrence, protection of the public, or rehabilitation;" (2) be consistent with the Sentencing

13  Commission's policy statements; and (3) must involve "no greater deprivation of liberty than is

14  reasonably necessary to serve the goals of supervised release."  *Id.* at 1190-91 (quotations and citations

15  omitted).

16         Conditions 6 through 10 involve a greater deprivation of liberty than reasonably necessary to

17  serve the goals of supervised release.  The goal of these conditions—monitoring Ms. Myles' computer

18  and Internet use to ensure she does not engage in a criminal act like this again—are adequately

19  protected by special condition 5, which Ms. Myles agreed to in her plea agreement.  *See* Dkt. 23, p. 5,

20  ¶ 9. That condition requires Ms. Myles to submit her "person, residence, office, vehicle, electronic

21  devices and their data (including cell phones, computers, and electronic storage media), and any

22  property under her control" to a suspicionless search by the probation office, and other law

23  enforcement.  Because this condition gives the probation office an opportunity to monitor Ms. Myles

24  computer, cell phone and Internet usage, conditions 6 through 10 should be stricken as explained in

25  more detail below.

26

27  _____

28  [8] The firearms found at 1072 65th Street in Oakland on June 8, 2016, had nothing to do with Ms. Myles.  *See* PSR ¶ 31.  She did not live at that residence, was not present at the time of that search and was never implicated, arrested or charged in the case involving Cedric Houseal and Brianna Miller.

A.   **Condition #6: No Computer Use Without Prior Approval.**

Proposed condition 6 prohibits Ms. Myles from possessing or using a computer without the prior approval of the probation officer.  "Computer" is defined broadly and includes cell phones.  This condition is extremely broad: it essentially requires Ms. Myles to get permission from her probation officer any time she makes a phone call or sends a text message to anyone, including her own probation officer.  Such a restriction is overbroad and unworkable.

B.   **Condition #7: Enrollment in CIMP.**

Condition 7 requires Ms. Myles to enroll in the probation office's Computer and Internet Monitoring Program ("CIMP").  That is all the proposed condition says; it provides no further insight into what the CIMP program entails.  The Ninth Circuit has held that in order to comply with the Fourth Amendment's prohibition against unreasonable searches and seizures, a computer monitoring condition "must be narrowly tailored—producing no greater deprivation of liberty than is reasonably necessary." *United States v. Sales*, 476 F.3d 732, 737 (9th Cir. 2007).  The court explained in *Sales* that a monitoring condition that "gives no indication as to what kinds or degrees of monitoring are authorized" is impermissibly overbroad because "monitoring software and/or hardware takes many forms, with greatly varying degrees of intrusiveness." *Id.* at 737-38.  Because condition 7 as written does not specify how the probation office will monitor Ms. Myles' computer use, it is overbroad and should be stricken.

C.   **Condition #8: No Internet Access Without Prior Approval.**

Proposed condition 8 prohibits Ms. Myles from using the Internet with the prior approval of her probation officer.  The Supreme Court recently explained that the Internet and cyberspace is one of "the most important places (in a spatial sense) for the exchange of views" and receives full First Amendment protection. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).  Moreover, the Ninth Circuit has noted that "[u]se of the Internet is vital for a wide range of routine activities in today's world—finding and applying for work, obtaining government services, engaging in commerce, communicating with friends and family, and gathering information on just about anything, to take but a few examples. Cutting off all access to the Internet constrains a defendant's freedom in ways that make it difficult to participate fully in society and the economy." *LaCoste*, 821 F.3d at 1191.

1    As a result, the Ninth Circuit held in *LaCoste* that prohibiting a defendant "from making any use

2 of the Internet without first getting his probation officer's approval….involves a greater deprivation of

3 liberty than is reasonably necessary" to further the goals of supervised release. *Id.* It explained that

4 such a condition has only been upheld in two "limited circumstances:" when "use of the Internet was

5 'essential' or 'integral' to the offense of conviction, or when the Internet played no role in the offense

6 of conviction but the defendant had a history of using the Internet to commit other offenses." *Id.*

7    Neither of these limited circumstances are present here. While Ms. Myles' offense did involve

8 the use of a computer, that was not an "essential" or "integral" aspect of the offense as it would be in a

9 prosecution for possession of child pornography. Nor does Ms. Myles have a history of using the

10 Internet to commit other crimes. While there are some cases where such an Internet restriction is

11 reasonable, such as a child pornography case, this is not one of them.

12 **D.   Condition #9: Random Inspections of Computer Equipment.**

13    Proposed Condition 9 orders Ms. Myles to consent to "periodic unannounced examinations of

14 her computer equipment," including the copying of all data from her computer. This proposed

15 condition is redundant and duplicative of proposed special condition 5, which requires Ms. Myles to

16 submit her "person, residence, office, vehicle, electronic devices and their data (including cell phones,

17 computers, and electronic storage media), and any property under her control" to a suspicionless

18 search by a probation officer. Condition 5, which Ms. Myles agreed to in her plea agreement,

19 encompasses the search contemplated in special condition 9. *See* Dkt. 23, p. 5, ¶ 9. There is no need

20 to impose both conditions.

21 **E.   Condition #10: Prohibition on Use of Data Encryption.**

22    Proposed special condition 10 prohibits Ms. Myles from using "any data encryption technique or

23 program." It would be impossible for Ms. Myles to comply with this condition. Most modern

24 computers and smartphones have encryption techniques and programs built directly into the device.

25 For example, the iOS operating software on an Apple iPhone has encryption tools built in that a user

26 cannot turn off. As Apple explains on its website, "Encryption protects trillions of online transactions

27 every day. Whether you're shopping or paying a bill, you're using encryption. It turns your data into

28 indecipherable text that can only be read by the right key. We've been protecting your data for over a

1    decade with SSL and TLS in Safari, FileVault on Mac, and encryption that's built into iOS."[9]

2    Websites use encryption routinely to safeguard sensitive data.  Wells Fargo's online banking website

3    notes that "From the moment account information leaves your computer to the time it enters Wells

4    Fargo's system, all online and mobile banking sessions are encrypted. We employ strong encryption

5    software to help protect your accounts. Wells Fargo also only supports browsers that adhere to our

6    high encryption standards."[10]

7         The Ninth Circuit has rejected similarly unworkable computer use restrictions.  In *United States*

8    *v. Goddard*, 537 F.3d 1087 (9th Cir. 2008), the court found that a supervised release condition that

9    required a defendant to obtain the probation office's "approval before making any software

10   modifications is both unworkable and overbroad."  537 F.3d at 1090.  It explained "[s]oftware on any

11   computer connected to the Internet changes constantly" and thus the condition would prevent the

12   defendant "from using any computer at work without continually contacting his probation officer. This

13   is more restrictive than necessary."  *Id.*  The same is true here: the condition is unworkable and the

14   only way for Ms. Myles to comply would be abandon using a computer, cell phone or the Internet all

15   together.  The condition should be stricken.

16                                    <u>**CONCLUSION**</u>

17        Ms. Myles asks this Court to vary downward and sentence her to five years in the custody of the

18   BOP, to be followed by eight years of supervised release.  She requests the Court recommend the BOP

19   designate her to FCI Dublin and recommend she participate in the BOP's Residential Drug Abuse

20   Program.

21

22   DATED:     July 3, 2017                          STEVEN G. KALAR
                                                      Federal Public Defender
23

24                                                          /S/
                                                      HANNI M. FAKHOURY
25                                                    Assistant Federal Public Defender

26

27   _____

28   [9] *See* https://www.apple.com/privacy/approach-to-privacy/#safe-device.

     [10] *See* https://www.wellsfargo.com/privacy-security/fraud/protecting-you/.

     DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
     *United States v. Myles*, CR 16-409-HSG